# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA      :      CRIM NO. 3:11CR00127 (AWT)

vs.      :

DAVID BOURQUE      :      FEBRUARY 8, 2012

<u>REDACTED</u>
## <u>DEFENDANT'S SENTENCING MEMORANDUM</u><br><u>FOR DOWNWARD DEPARTURE OR</u><br><u>NON-GUIDELINE SENTENCE</u>

The defendant, David Bourque, age 51, stands before this Court convicted of violation of 18 U.S.C., Section 2252 A(a)(2), Receipt and Distribution of Child Pornography. Mr. Bourque has no prior criminal history. The offense conduct consist of possessing numerous images of videos of child pornography, primarily involving young boys, ages 8-14. (Note: While there are other images/videos of other category of minors, e.g. young females or babies, there is no evidence he actively sought out these images or intentionally viewed the same. Rather, others with whom he traded images apparently put them in unsolicited with the rest of the sought after images.)

BROWN PAINDIRIS & SCOTT, LLP – ATTORNEYS AT LAW

100 PEARL STREET – HARTFORD, CONNECTICUT 06103 – (860) 522-3343 – JURIS NO. 20767

The defendant for a period of <u>months</u> used the internet to share photos and videos with other individuals; this wrongdoing started in August of 2010. It is important to note that there is no claim that Mr. Bourque produced any child pornography. There is no claim that Mr. Bourque sold any child pornography and profited from the child pornography business. Rather, he traded images with other users. While there were many illicit images that found their way into Mr. Bourque's computers, there is no claim that he viewed them all or indeed that he knew the content of every image. (See para 18 P.S.R.). Sometimes, apparently, Mr. Bourque downloaded a large number of images after simply looking at the "thumbnail" content of the folder; other times he would download an entire folder without looking at their content. (See para 18 of P.S.R.) There is no evidence or even allegations that he attempted to contact any minors for illicit reasons during this period of time; (also see para 25 of P.S.R.). Apparently, on occasion, traders of these images downloaded numerous images/videos onto Mr. Bourque's computer without Mr. Bourque necessarily knowing when it was being done. This not to suggest he had not given permission to do so. Excluding trading, there is no evidence that he did anything with these images other than look at some of them over a period of months (not years).

2

A question for this court is <u>why</u> did this former police officer, who dedicated over <u>thirty</u> years of his life to serving the community as a police officer, engage in this illegal activity. He was so good at his job that until his arrest he was in line for the chief's job in Granby, CT. During his decades of service to his community, he had many difficult and traumatic assignments. The most difficult assignment was being assigned year after year to investigate serious car accidents, including hundreds of fatalities. Going to the scene of the accidents and seeing victims in horrible shape/condition, including loss of limbs and young peoples lives destroyed became overwhelming. Toward the end of his illustrious career, he became more and more distraught about having to handle these assignments.

Mr. Bourque, quite candidly, finds himself having difficulty explaining why he crossed the line from honorable citizen to someone looking at this material; a secret life. Mr. Bourque states that at some point in the summer of 2010 he went from looking at legal but questionable photographs of nudism to viewing child pornography. For reasons he is still trying to understand, his primary interest seemed to rest on viewing males between the age of 7 to 14.

BROWN PAINDIRIS & SCOTT, LLP – ATTORNEYS AT LAW

100 PEARL STREET – HARTFORD, CONNECTICUT 06103 – (860) 522-3343 – JURIS NO. 20767

Shortly after being confronted with his misconduct, Mr. Bourque started treatment with Leslie Lothstein, Ph.D., ABPP; Dr. Lothstein is the Director of Clinical Psychology with the Institute for Living at Hartford Hospital and has been a long recognized expert in the treatment of those who have engaged in viewing child pornography, as well as those who have acted out and engaged in sexual abuse and those who have acted out in illicit fashion with minors and others. Mr. Bourque has regularly attended meetings and activities, participated in his treatment since his arrest. (It is to be noted that for a period of time, while married to his wife Dana, he lived with her minor female child. Obviously, under these circumstances, if Mr. Bourque were so inclined, he had opportunities to engage in illicit activities with his step-daughter. DCF fully investigated this situation after his arrest and found no evidence that he ever engaged in any inappropriate behavior with this child.)

What Dr. Lothstein concluded was in his experienced opinion Mr. Bourque suffers from "severe PTSD". Dr. Lothstein used many tools at his disposal to reach this conclusion. Aside from numerous treatment sessions with Mr. Bourque, he engaged psychological testing, as well as PTSD testing and Risk Assessment testing. (Note: this is contrary to his interaction with Dr. Walter Borden, who only interviewed Mr.

4

Bourque twice and who failed to test Mr. Bourque relative to PTSD testing or Risk Assessment testing.)

Dr. Lothstein made it clear that based upon his many years of dealing with child molesters and those that act out, that Mr. Bourque does not fit that profile. On the front page of his report, Dr. Lothstein notes that after interacting with Mr. Bourque numerous times since May of 2011, he strongly believes there is no evidence of psychopathy or Antisocial Personality Disorder. Dr. Lothstein also notes that Mr. Bourque's **"... community safety risk can be managed satisfactorily**" and that he "**... is benefiting from his sex offender treatment**." (See page 1-2 of report.)

Unlike Dr. Borden, who only saw the defendant twice and while doing so spent part of the time only administering two psychiatric and diagnostic tests. (See Borden's report page 2), Dr. Lothstein interviewed Mr. Bourque seven times for a total of nine hours and coupled that with <u>26</u> group therapy sessions between May and November before issuing his report. Additionally, unlike Dr. Borden, he reviewed over thirty documents specifically related to Mr. Bourque. Unlike Dr. Borden, who administered just two tests; Dr. Lothstein administered at least <u>seven</u> (7) in-depth diagnostic tests (see page 3-4 of Lothstein's report). Finally, unlike Dr. Borden who interviewed <u>no one</u>

5

aside from the defendant, Dr. Lothstein interviewed both parents, a sibling and the two daughters of David Bourque before rendering his opinion.

After starting this brief counsel received an updated report from Dr. Lothstein, who reviewed Dr. Borden's "evaluation"; a careful reading of the February 1st update confirms that Dr. Borden's evaluation is indeed very suspect, given his minimal interaction with Mr. Bourque. (See attached.)

One can only conclude that Dr. Lothstein is in a far superior position to evaluate Mr. Bourque and render his professional opinion than Dr. Borden. For Dr. Borden to attempt to minimize the psychological impact of having to witness the mangled bodies of adults and children in deadly traffic accidents year after year defies common sense. Over the years, Mr. Bourque believes he was called to over 200 accident fatalities, as well as many other serious car accidents. While Mr. Bourque is not claiming PTSD blinded him such that he did not know he was violating the law, there can be little doubt that such a condition could impair judgment as one attempts to escape the horror of witnessing such events. PTSD arose only because he was a dedicated public servant just doing his job.

6

Dr. Lothstein couples his PTSD diagnosis and the inherent stress that goes with certain jobs, with dark secrets lingering in Mr. Bourque's mind since being sexually molested as a child. Again, while such events do not excuse Mr. Bourque's conduct, it is fair to factor this information into the sentence under 18 U.S.C. 3553 (a)(1), characteristics of the defendant. Over the years doing the work that he did simply wore on him and resulted in skewed judgment, resulting in a loss of his wife, his step-daughter, his job and his dignity; every day the fear of prison hangs over his head.

In sum, Dr. Lothstein notes the lack of deviant sexual acting out. He concludes Mr. Bourque suffers from major depressive disorder without psychotic features as well as PTSD, chronic; finally, he notes that this is all complicated by an obsessive compulsive disorder. (He also notes that Mr. Bourque suffers from Ulcerative Colitis, severe, requiring IV medication every eight (8) weeks.) Dr. Lothstein concludes that Mr. Bourque's viewing of child pornography appears to be opportunistic and part of a diminished mental capacity at the time of the instant offense. Mr. Bourque "... does not have the biomarkers or history common among paraphilias . (See page 31 of Lothstein's report.)

7

David Bourque had a childhood that included being sexual assaulted while in elementary school. While taking a polygraph test, it slowly came out that he was assaulted by a friend of his family and he has harbored this sad event secretly for decades. Any chance to pass a polygraph test faded as he had to deal with the shame and horror of those events. What Dr. Lothstein tells us in his report is that since his arrest David Bourque has made a sincere effort to get to the core of his mental health issues and to deal with the events of his childhood coupled with the events of his profession that required him to routinely view horrific scenes year in and year out of bodies of both the young and old in their first moments of death.

Shortly after his arrest in April of 2011, while still in the hospital recovering from his aborted attempt to commit suicide, Mr. Bourque agreed to fully cooperate with federal investigators. (Note: at this time no cooperation agreement had been signed; rather Mr. Bourque, after having several days to think about it, felt it was the right thing to do even though the government at that time made no "deal" relative to the information they found.) On April 20, 2011, Mr. Bourque provided the FBI and CT State Police with information on how he encrypted his hard drive and then provided them with the correct passwords to circumvent said encrypted hard drive and obtain his

8

collection of child pornography. While the State Police believed that they were "close" to cracking said codes, they, in fact, at that point had failed to do so. The vast majority of images and videos seized only came to light <u>after</u> Mr. Bourque's cooperation. Now the government has taken Mr. Bourque's cooperation and used the fruits of that cooperation against Mr. Bourque. While the federal authorities are not violating any of Mr. Bourque's "rights" in doing so, query whether as a matter of public policy it's a good idea; it does not bode well for those coming after Mr. Bourque to make the same choice he did back in April.

In addition to assisting the law enforcement authorities in their investigation against him, he later cooperated by assisting law enforcement authorities by discussing people he traded with on a <u>non-commercial</u> basis. As a result of his relatively quick cooperation, the government entered into under a 5K1 understanding. Law enforcement officers were successful in tracking down several other individuals who were engaged in violating 18 U.S.C., Section 2252(a)(2).

Subsequently, the defendant voluntarily left the hospital and entered a plea to the present charges. (Note: the Court, of course, carefully questioned Mr. Bourque to insure that Mr. Bourque was not under the influence of any medication.) Mr. Bourque

9

has since made himself available to answer any additional questions law enforcement may have.

At one point, Mr. Bourque agreed to take a polygraph concerning outstanding issues the government may have had. While there was no evidence that Mr. Bourque had inappropriately touched any minor, the government wanted to attempt to verify the same. As this court is fully aware, the results of polygraphs are not admissible into trial due to their unreliability. The following should be noted. What was expected to last a few hours, lasted nearly seven hours. Counsel's experience over 40 years in dealing with clients who take the test is such that counsel has reached the following conclusion: If you are lying, you will fail the test; if you are being truthful you <u>might</u> pass. The problem is <u>any</u> material deception somewhere in the mind will cause one to fail the test, <u>irrespective</u> of whether the answer given is truthful. (If the court desires at sentencing, counsel could give several such instances involving federal and state authorities.)

In the instant matter, the testor felt that in some way Mr. Bourque was being evasive; however, during the test itself it came out that apparently when Mr. Bourque was a small child, Mr. Bourque was sexually assaulted by a non-relative. This "secret" had been suppressed since childhood. Mr. Bourque broke down and became emotional;

10

no doubt all of this materially affected his ability to be a good candidate for this test. Mr. Bourque takes exception to several statements made in the polygraph report.

In any event, notwithstanding efforts to investigate this issue, coupled with a total lack of <u>any</u> response by the public to this well publicized arrest and prosecution of a fairly public person; coupled with no evidence from DCF, which did an investigation of his step-daughter and wife; coupled with statements from his own daughters, now adults, there is no evidence whatsoever that Mr. Bourque is anything more than a voyeur. (Note: Again while it is true that Mr. Bourque engaged in trading photos/videos, there is no evidence whatsoever that he engaged in <u>commercial</u> trading – e.g. for money.)

## <u>THE GUIDELINES</u>

Ironically, as it relates to Section 2G2.2 <u>et seq</u>., of the Federal Sentencing Guidelines, they, themselves, are obscene. They, for the reasons which follow, do a great disservice in assisting the federal courts in their respective attempts to fashion a fair and substantially reasonable sentence consistent with federal sentencing law, 18 U.S.C. Section 3553, <u>et seq</u>.; on several levels they failed in that task. One needs look no further than the Second Circuit for confirmation of the same. <u>United States v. Justin</u>

11

Dorvee, 616F.3d 174, 2010 U.S. App. Lexis 16288 (2010) sets the benchmark in this

observation.  Also see <u>United States v. David Greber</u>, 2010 U.S. App. LEXIS 2 1980, a

Third Circuit case decided also in 2010, which reinforces the logic and conclusions of

the Second Circuit

    In the instant matter, under Guideline calculations, David Bourque's score,

incredibly was 37 under Section 2G2 of the Guideline calculations as follows:

a.  Twenty-two (22) points for possession and "distribution", even though his sin

    was trading with third parties on a <u>non-commercial</u>, non economic cash basis;

    even though there was no claim that he produced or created any of the photos

    or videos under his control.  Under the Guidelines he was being treated the

    same as someone who had profited by thousands of dollars for selling the

    same videos and images.

b.  Two (2) points more for prepubescent minors, even though it's part of the

    crime; when was the last time people similarly charged with possessing more

    than 600 images did <u>not</u> have similar inventories.

c.  Five (5) points more because he obtained a "thing of value," other images;

    this means, again, he is being treated to an exposure of an extra <u>89 months in</u>

12

prison (level 37 instead of 32) for engaging in some non-commercial activity. The Guidelines fail, again, to distinguish commercial vs. non-commercial activity.

d. Four (4) points, an extra 75 months (level 37 instead of level 33) because it portrays the child in a sadistic or masochistic setting. When was the last time the court entertained a child pornography case with 600 or more images, in which the defendant did not get this enlargement.

e. Two (2) points for use of a computer; has this Court at any time had a child pornography case in the twenty-first century where a computer was not involved in the possession and/or distribution cases. The computer use is always a part of these crimes. This is an extra 42 months in prison (level 37 instead of level 35).

f. Five (5) points for more than 600 images. A few clicks of the mouse easily brings on more than 600 images. For that act the Guidelines add on an extra 89 months exposure in prison. Again, an act found in many, many, many of these cases. In sum, Mr. Bourque is exposed to twenty years in prison (note:

13

it would have been higher under the Guidelines except for the maximum sentence).

Mr. Bourque, who apparently in the privacy of his home looked at images of minors engaged in illicit sexual activity and swapped his for other people's child pornography is exposed to two decades in prison. Consequently, adherence to the Guideline results in virtually no distinction between the sentences for defendants like Mr. Bourque, and the sentences for the most dangerous offenders, who, for example distributed child pornography for pecuniary gain and who fall into higher criminal history categories. According to the Second Circuit, these results are fundamentally incompatible with 18 U.S.C. Section 3553(a). See USA v. Dorvee, 616 F.3d, 174, 187.

The Second Circuit, itself, recognizes the absurdity of these Guidelines. If, for example, had Mr. Bourque, instead of looking at those photos/videos, actually engaged in sexual conduct with a minor his applicable Guidelines range would have been considerably lower. Id. No doubt this court has, itself, handled sexual crime cases with Guidelines lower than twenty years.

This history of the evolution of the Guideline explains how we got to the point where people who look at this obscene material for non-commercial reasons end up

14

being exposed to an even harsher sentencing than those that intentionally inflict physical harm on minors and others. The Sentencing Commission has been a victim to Congress and the various political gains congressmen attempts to achieve. Without seeking any impact from the Commission, Congress passed the so-called "PROTECT ACT" in 2003. This Act, according to a former U.S. Attorney in New York, was the "most significant effort to marginalize the role of the Sentencing Commission" since its inception. Id. at 174.

This continuous tampering with the Guidelines by Congress resulted in adding the 600 images rule, the use of a computer rule and the sadistic or masochistic conduct rule. What is interesting to note is that in 94% of all child pornography cases, the enhancement is added for having images of prepubescent minors; 97% for use of a computer; 73% for images of sadistic or masochistic conduct; and 63% for having 600 or more images. (See U.S. Sentencing Commission, Use of Guidelines and Specific Offense Characteristics for 2009.) Consequently, sentencing enhancements typically result in run-of-the-mill cases running at or close to the statutory maximum of 20 years. Id. at 186.

BROWN PAINDIRIS & SCOTT, LLP – ATTORNEYS AT LAW

100 PEARL STREET – HARTFORD, CONNECTICUT 06103 – (860) 522-3343 – JURIS NO. 20767

Some compare the Child Pornography Guideline to crack cocaine guidelines struck down in <u>Kimbrough v. United States</u>, 552 U.S. 85, 109-10, 128 S.Ct. 558, where the Supreme Court held that it was not an abuse of discretion for a district court to conclude that it was <u>not</u> an abuse of discretion to find the Guidelines typically yield a sentence "greater than necessary" to adhere to the goals of Section 3553(a), <u>USA v. Dorvee</u>, at 188. In <u>Dorvee</u> it found that the same logic is applicable for the child pornography enhancements found in Section 2G2.2 of the Guideline, on a <u>policy</u> basis as well as on substantive basis. Also see <u>U.S. v. Rigas</u>, 583 F.3d 108, 12-3 (2d Cir. 2009), where the court concluded that "substantive reasonableness" review is intended to provide a backstop against sentences that are shockingly high or low or otherwise not supportable as a matter of law. <u>Id</u>. at 123.

In the instant matter, as previously stated, the defendant's Guideline range is 37. While initially this court is compelled to consider this range, it, with all due respect, cannot presume that a Guideline sentence is reasonable for any particular defendant and, accordingly, <u>must</u> conduct its own independent review of the Section 3553(a) sentencing factors. See <u>U.S. v. Cavera</u>, 550 F.3d 180, 189 (2nd Cir. 2008). As this court has stated on many occasions it is the duty of this court to impose a sentence sufficient,

16

but not greater than necessary to comply with the specific purposes set forth in 18 USC, 3553(a)(1), U.S. v. Dorvee, supra at 182-183. Providing a 37 point level to most similar cases as well as those much more serious cases makes a mockery of the Guidelines and offends 18 U.S.C. 3553.

A review of the facts in the instant case reveals that at the end of the day Mr. Bourque is just, sadly, another voyeur, who went from looking at legal material to crossing the line and for several months looking at child pornography. It was wrong and he has acknowledged it. More so, early on he made the fundamental and critical decision to waive his rights to remain silent and not have a trial. Instead he assisted federal and state investigators in the investigation of his own case. At the time Mr. Bourque agreed to cooperate and be forthright last April, federal and state authorities had no idea as to the volume of images he had.

Mr. Bourque, in addition to helping the authorities unlock his computer, cooperated in giving said authorities key information to help the law enforcement officers arrest at least three individuals who engaged in similar or, perhaps, greater illegal child pornographic activity. (This led to a 5K1 motion being filed in this matter to be discussed.) As a consequence of his wrongdoing, in addition to the instant

17

prosecution, he lost his job; lost his wife; lost the society of his step-daughter; he was publically scorned in the media; many friends are now former friends. Additionally, all the goodwill generated for working in public service for over thirty years has also been lost. It's all gone.

The irrationality found in Section 2G2, et seq. leaves the question of where to start in the determination of a fair and just sentence in the instant offense. As much as the government may claim that there are factors that take this case out of the ordinary voyeur case, in truth that is exactly what we have. The government will point to the large volume of images and videos found in the computer (only obtained with the defendant's help). Yet no evidence is presented as to how many images the defendant actually viewed. (See paragraphs 18, 61). There were volumes downloaded without him reviewing the same. Many he did review. He categorically denies creating any of the named subfolders. Rather, after giving his permission, some people simply put the files and images onto his computer. So while he takes full responsibility for allowing the images to be put onto his computer, he simply did not know their full content or volume. He sought only images of 7-14 year old boys (bad enough), yet the downloads contained images he never sought.

18

Additionally, the government will point out that some of the chats between Mr. Bourque and other people interested in trading images discussed certain topics such as rape and other hideous topics. Mr. Bourque claims that it was puffing just to induce others to trade with him. Mr. Bourque absolutely denies any acting out in the area. It is to be noted that while there was some chats on these subjects, the <u>vast</u> majority of time it seemed Mr. Bourque and the others were spending to insure that they were not dealing with law enforcement or talking about, as Mr. Bourque's case, looking for images of boys. To use these chats in court is to distort the true, albeit disgusting, goals of Mr. Bourque. No evidence, as earlier mentioned, indicates that, contrary to those graphic chats, Mr. Bourque did anything to further those ideas. Mr. Bourque never engaged in inappropriate conversations with minors and he never created or paid for any illegal material. It was nothing more than "dirty talk" (see page 4, para 5 of Dr. Lothstein update, attached) and to suggest more is to engage in speculation and surmise; neither of which should factor into a sentence.

Because the Guidelines are of no use and because under Section 3553 factors, Mr. Bourque's starting point should be five years or less in light of no criminal history, no acting out and the typical sentence given to those similarly charged for such offenses

BROWN PAINDIRIS & SCOTT, LLP – ATTORNEYS AT LAW

100 PEARL STREET – HARTFORD, CONNECTICUT 06103 – (860) 522-3343 – JURIS NO. 20767

where the distribution consists of non-commercial activity. From there, then the 5K1 motion should allow this court to go below the aforementioned range (if it is to have any material effect). In considering how far to go below the five year maximum sentence, Mr. Bourque requests that the court factor in the following information:

1.     Over 30 years of dedication to public service as a police officer. There is no evidence/allegation that Mr. Bourque exploited his position as a police officer to engage in the instant offense.

2.     His cooperation was <u>very</u> helpful to law enforcement; his cooperation has led to the arrest, prosecution and conviction of at least three, if not more, individuals.

3.     This is not an aggravating case in that the facts review that he engaged in this activity for his own self-serving reasons in the privacy of his own dwelling.

4.     Dr. Lothstein makes it clear that over the years, especially the last decade, working at serious and fatal traffic accidents skewed his judgment and resulted in his suffering from Post-Traumatic Stress Disorder. How much that affected his ability to think clearly, one does not know; nevertheless this debilitating condition does affect people in a material way and can and did affect his brain and his thinking processes. So while he knew the possession of such material was illegal, it appears that such a

BROWN PAINDIRIS & SCOTT, LLP – ATTORNEYS AT LAW
100 PEARL STREET – HARTFORD, CONNECTICUT 06103 – (860) 522-3343 – JURIS NO. 20767

condition played some role in this otherwise honest, hardworking public servant crossing the line.

   5.   As a sole caretaker, he has raised two girls to become responsible, law-abiding and successful young women (who deeply love their father), that knows their father has always been there for both of them.

   In this district it is not unknown for those individuals engaged in possessing child pornography to receive sentences in the 18 months to 24 months range.

   While one might argue that generally speaking someone engaged in trading photos could get more time, it is respectfully submitted that in the instant matter under the 5K1 motion filed by the government earlier, treating Mr. Bourque similar to others that possess pornography would be more consistent with 18 U.S.C. 3553 and be one substantive reasonableness and one where the sentence imposed is no greater than necessary to meet the objectives of fair sentencing.

## 5K2.13 DIMINISHED CAPACITY

   Section 5K2.13 of the Guidelines allows this court to factor whether the defendant committed the offense while suffering from a significantly reduced mental capacity where the same contributed substantially to the commission of the offense.

21

The three exceptions would be: 1) if the defendant used drugs; not applicable; 2) if the crime itself involved a serious threat of violence; not applicable and 3) the defendant had a criminal history; also not applicable.

Dr. Lothstein makes it quite clear that at the time in question, Mr. Bourque suffered from diminished capacity due to his job in accident reconstruction from law enforcement that required him to fairly routinely visit horrific vehicle accident scenes and view loss of life and catastrophic human injuries to those involved in these car accidents. His suffering from chronic PTSD, according to thoughtful analyses of Dr. Lothstein, clearly affected Mr. Bourque's mental health state. He suffers from "distinct psychiatric disorders". It is clear that his condition skewed his thinking process and materially affected his judgment in engaging in the instant offense. While not excusing his conduct, the Guidelines and 3553 both recognize that these are factors the court may employ in modifying the severity of a sentence. It is fair to note that his condition arose as a result of his dedication to serving the public for over 30 years. Wherefore, a reduction or modification under these circumstances would be justified.

BROWN PAINDIRIS & SCOTT, LLP – ATTORNEYS AT LAW

100 PEARL STREET – HARTFORD, CONNECTICUT 06103 – (860) 522-3343 – JURIS NO. 20767

## NON-GUIDELINE SENTENCE

In the alternative for the reasons heretofore stated the defendant would move for a non-guideline sentence (as opposed to one employing a downward departure sentence). The point of this memorandum is to suggest the court find a fair sentence, recognizing that this first offender engaged in this unlawful activity for several months, but for 51 years led an otherwise honest, hard-working life, contributing during his 30 plus years as a police officer to the common good.

Finally, it is to be noted that David Bourque, since at least 2000, has suffered from chronic ulcerative colitis and has been under the care of Central Connecticut Gastroenterology for over 10 years. Part of his treatment involves an annual colonoscopy; he suffers from frequent bloody diarrhea. He requires IV infusion every 8 weeks and needs to be monitored by a physician with appropriate lab work.

BROWN PAINDIRIS & SCOTT, LLP – ATTORNEYS AT LAW

100 PEARL STREET – HARTFORD, CONNECTICUT 06103 – (860) 522-3343 – JURIS NO. 20767

Wherefore, if the court sees fit to impose a sentencing requiring incarceration, then it is requested that the court request BOP to do so at a facility that specializes in medical treatment.

DEFENDANT, DAVID BOURQUE

By_____

Richard R. Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, Suite 1100
Hartford, CT 06103
Federal Bar No. ct00009
Tel. (860) 522-3343
Fax (860) 522-3490

24

REDACTED

REDACTED

26

REDACTED

REDACTED

REDACTED

## CERTIFICATION

This is to certify that a copy of the foregoing motion was delivered by email

and/or U.S. postal mail to the following on this 8th day of February, 2012:

A.U.S.A. Raymond Miller
Office of the U.S. Attorney
157 Church Street, 23rd Floor
New Haven, CT  06510

U.S.P.O. Jonathan Sitek
Office of U.S. Probation
450 Main Street, Room 735
Hartford, CT  06103

Richard R. Brown, Esq.

BROWN PAINDIRIS & SCOTT, LLP – ATTORNEYS AT LAW

100 PEARL STREET – HARTFORD, CONNECTICUT 06103 – (860) 522-3343 – JURIS NO. 20767